

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | No. 3:24-cr-00179 |
| v. | ) | 18 U.S.C. § 2 |
| | ) | 18 U.S.C. § 1341 |
| | ) | 18 U.S.C. § 1343 |
| | ) | 18 U.S.C. § 1349 |
| JOHN ALAN NEBEL | ) | |

# INDICTMENT

### COUNT ONE

THE GRAND JURY CHARGES:

At all times material to this Indictment:

#### Background

1. Sumner Wholesale Auto Group LLC ("SWAG") was an auto parts wholesaler located in Hendersonville, Tennessee, in the Middle District of Tennessee. Its customers included other auto parts distributors and auto dealerships. SWAG also operated under the name of SWAG Performance & Off-Road LLC.

2. The defendant, **JOHN ALAN NEBEL**, was a founder and co-owner of SWAG.

3. An individual known to the Grand Jury whose initials are "J.N." was an independent contractor for SWAG.

4. Individual 1 was a graphic designer who supplied labels, decals, and other print items to SWAG through his employer and other companies.

5. Ford Motor Company ("Ford") offered a rebate program to purchasers of Ford auto replacement parts, including diesel fuel injectors. Ford sold its fuel injectors in packaging bearing

alphanumeric part numbers and logos that were trademarked by Ford, including the Ford logo and the Motorcraft logo. Ford also included on the packaging for the replacement part a deposit return sticker. Ford charged approximately $300.00 for each replacement fuel injector. The purchase of a genuine Ford replacement fuel injector included the right to claim a $180.00 deposit return ("rebate") from Ford. The terms of the rebate program required the following: (1) the purchase of a genuine Ford replacement fuel injector; (2) the return of the old Ford fuel injector; and (3) the return of the Ford box in which the replacement fuel injector part was sold. The old fuel injector is referred to as a "core" in the automotive industry.

6. PayPal is an online service that allows individuals and businesses with PayPal accounts to transfer money from bank accounts or credit cards to other individuals and businesses that also have PayPal accounts. PayPal does not maintain servers in the state of Tennessee.

7. Capital One Bank (USA), N.A. is a corporation that, among other businesses, issued consumer credit cards and provided credit card processing services for merchants. Capital One Bank does not maintain servers in the state of Tennessee.

## The Conspiracy

8. Beginning at least as early as November 2015, and continuing through at least in or about November 2019, in the Middle District of Tennessee and elsewhere, **JOHN ALAN NEBEL** and others known and unknown to the Grand Jury, did willfully, knowingly, and unlawfully combine, conspire, confederate, and agree with each other to commit offenses against the United States, namely, wire fraud, in violation of Title 18, United States Code, Section 1343, and mail fraud, in violation of Title 18, United States Code, Section 1341.

## Purpose of the Conspiracy

9. The purpose of the conspiracy was for **JOHN ALAN NEBEL** and his

2

coconspirators to engage in a scheme to defraud and cause others to defraud Ford, and to enrich themselves financially by buying or otherwise acquiring genuine Ford cores, which SWAG then packaged and labeled with counterfeit Ford marks to give the false appearance of compliance with Ford's rebate program, thereby enabling others to fraudulently claim a Ford rebate payment not associated with the sale of any genuine Ford replacement part.

Manner and Means

10. It was a part of the conspiracy for **JOHN ALAN NEBEL** and his coconspirators to buy from various sources unboxed cores at discounted prices of approximately $35.00 to $45.00. The cores relevant to this Indictment were sourced from various locations, including scrap yards, distributors and other entities, but were not associated with any replacement service in which a genuine Ford replacement injector had been purchased for installation.

11. It was further a part of the conspiracy for **JOHN ALAN NEBEL** and his coconspirators to falsely represent to Individual 1 that SWAG was authorized to create, print, and affix Ford's logos and other marks on boxed cores sold by SWAG. Ford had not authorized SWAG to reproduce its logos, marks, or packaging.

12. It was further a part of the conspiracy that **JOHN ALAN NEBEL** and his coconspirators had Individual 1 create and obtain labels, decals, and other items bearing Ford's marks. For example, on approximately May 12, 2017, J.N. emailed Individual 1 requesting to see, before finalizing SWAG's order, a sample image of the Ford core decal created by Individual 1.

13. To ensure that the cores returned to Ford would imitate valid rebate claims, it was further a part of the conspiracy that **JOHN ALAN NEBEL** and his coconspirators would monitor the quality and appearance of the counterfeit labels and decals. For example, on August 29, 2019, J.N. texted **NEBEL** about a recent order of counterfeit labels and decals, and asked "how the labels

3

look"? **NEBEL** responded that the labels "Look really good." Later that day, **NEBEL** texted that the labels were "getting too shiny/glossy" and agreed to show J.N. a "non shiny" version.

14. It was further a part of the conspiracy that **JOHN ALAN NEBEL** and his coconspirators continued to order and use counterfeit labels despite SWAG's inability to obtain Ford's permission to use Ford's marks. For example, on approximately May 22, 2019, Individual 2 asked for an authorization letter from Ford granting permission to use Ford's marks. **NEBEL** declined to provide a letter. **NEBEL** suggested using a different source to procure unauthorized labels, decals, and other items bearing Ford's marks.

15. It was further a part of the conspiracy that **JOHN ALAN NEBEL** and his coconspirators would pay Individual 2 for labels, decals, and other items bearing Ford's marks. For example, on approximately September 11, 2019, SWAG paid and caused to be paid to Individual 2 a PayPal payment of $1,483.80 for core labels and other items falsely bearing Ford's marks.

16. It was further part of the conspiracy that **JOHN ALAN NEBEL** and his coconspirators ordered cardboard boxes having the same dimensions as the boxes Ford used to package its cores. For example, on approximately October 8, 2019, SWAG paid and caused to be paid by credit card $828.00 to a paper company for flat unmade cardboard boxes needed to repackage cores.

17. It was further a part of the conspiracy that **JOHN ALAN NEBEL** and his coconspirators used and caused to be used the United States mail and private interstate commercial carriers in furtherance of the conspiracy. For example, on approximately October 11, 2019, SWAG received an order of counterfeit labels and decals bearing Ford's marks from a Kansas-based graphics company.

18. It was further part of the conspiracy that SWAG would package and label acquired cores with the counterfeit Ford labels, decals, and other imitation packaging to give the appearance as though these cores were associated with replacement part purchases, knowing that no valid replacement part purchases had occurred. SWAG would sell the packaged cores to its customers, including other wholesalers and dealerships, knowing those customers would make rebate claims to Ford as if there had been genuine purchases of Ford replacement parts.

19. It was further part of the conspiracy that **JOHN ALAN NEBEL** and his coconspirators at times sold the cores in packaging bearing counterfeit Ford marks for approximately $95.00 to $170.00 per unit, knowing that Ford offered a rebate of approximately $180.00 per replacement purchase. For example, on approximately October 25, 2019, **NEBEL** sold cores boxed in counterfeit packaging to a Minnesota-based distributor.

20. It was further part of the conspiracy that **JOHN ALAN NEBEL** and his coconspirators induced individuals willing to purchase from SWAG those cores sold in counterfeit packaging by providing gifts. For example, **NEBEL** gifted to one individual a gun safe and bed in exchange for purchasing said cores from SWAG.

21. It was further part of the conspiracy that customers who purchased from SWAG cores packaged in boxes bearing counterfeit Ford marks would subsequently obtain rebates from Ford Motor Company of approximately $180.00 per unit or thereby enable others to do so.

In violation of Title 18, United States Code, Section 1349.

## COUNTS TWO THROUGH THREE

THE GRAND JURY FURTHER CHARGES:

22. Paragraphs 1 through 21 of this Indictment are realleged and incorporated by reference as if fully set forth herein.

23. Beginning at least as early as November 2015, and continuing to in or about November 2019, the defendant, **JOHN ALAN NEBEL**, aided and abetted by others known and unknown to the Grand Jury, engaged in a scheme to defraud Ford Motor Company and others, and to enrich himself and others, by selling cores in packaging bearing Ford marks, and causing Ford to pay rebates that were not owed.

24. On or about the dates set forth below, in the Middle District of Tennessee and elsewhere, **JOHN ALAN NEBEL**, aided and abetted by others known and unknown to the Grand Jury, for the purpose of executing and attempting to execute the above-described scheme and artifice to defraud, and to obtain money and property by means of false and fraudulent pretenses, representations, and promises, and the concealment of material facts, knowingly caused to be transmitted by means of wire communications in interstate or foreign commerce, writings, signs, signals, pictures, and sounds, namely:

| Count | Date of Wire | Description of Interstate Wire |
|---|---|---|
| Two | 10/08/2019 | Capital One Bank electronic credit card payment of $828.00 from SWAG Visa account x2318 for purchase of flat unmade cardboard boxes. |
| Three | 10/25/2019 | Receipt of $11,440 electronic PayPal payment from a Minnesota distributor relating to sale of cores sold in counterfeit packaging bearing Ford marks. |

All in violation of Title 18, United States Code, Sections 1343 and 2.

COUNT FOUR

THE GRAND JURY FURTHER CHARGES:

25. Paragraphs 1 through 21 of this Indictment are realleged and incorporated by reference as if fully set forth herein.

26. On or about October 9, 2019, in the Middle District of Tennessee and elsewhere, **JOHN ALAN NEBEL**, aided and abetted by others known and unknown to the Grand Jury, for

6

the purpose of executing and attempting to execute the above-described scheme and artifice to defraud, and to obtain money and property by means of false and fraudulent pretenses, representations, and promises, and the concealment of material facts, knowingly mailed and caused to the following mailing to be sent and delivered by U.S. mail and by private and commercial interstate carrier, namely: a package of counterfeit labels and decals bearing Ford's marks, shipped from Kansas and delivered to Hendersonville, Tennessee.

## FORFEITURE ALLEGATION

27. Paragraphs 1 through 26 are reincorporated and realleged as if fully set forth herein in support of this forfeiture.

28. Upon conviction of any of Counts One through Four of this Indictment, **JOHN ALAN NEBEL** shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 981(a)(1)(c), any property constituting, or derived from, proceeds **NEBEL** obtained directly or indirectly, as the result of a violation of Title 18, United States Code, Sections 1349, 1343, or 1341, including but not limited to a money judgment representing the value of the proceeds of the scheme and artifice to defraud as set forth in Counts One through Four.

29. If any of the property described above, as a result of any act or omission of **JOHN ALAN NEBEL**:

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with, a third party;

    c. has been placed beyond the jurisdiction of the court;

    d. has been substantially diminished in value; or

    e. has been commingled with other property that cannot be divided without difficulty,

the United States shall be entitled to forfeiture of substitute property, and it is the intent of the

7

United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of **NEBEL**, up to the value of said property listed above, including the money judgments and specific property sought for forfeiture herein.

A TRUE BILL

_____
FOREPERSON

HENRY C. LEVENTIS
UNITED STATES ATTORNEY

*Stephanie N. Toussaint*

STEPHANIE N. TOUSSAINT
ASSISTANT UNITED STATES ATTORNEY